IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

LARRY L. KOGER,

    Plaintiff,

v.                                    CIVIL ACTION NO. 1:08-0909

NORFOLK SOUTHERN RAILWAY
COMPANY,

    Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the court is defendant's motion for a new trial or, in the alternative, remittitur.  On January 6, 2010, the court held a hearing on the motion.  For the reasons discussed below, the motion is DENIED.

## I. Background

Plaintiff, Larry L. Koger, was employed as a conductor for the defendant, Norfolk Southern Railway Company ("Norfolk Southern" or "NSRC").  The case arose out of workplace injuries allegedly suffered by plaintiff on July 29, 2007.  On that date, the locomotive on which plaintiff was working as a conductor derailed when it ran a red signal, causing the locomotive to proceed when it should not have.  As a result of injuries he allegedly sustained when the train derailed,  plaintiff filed a complaint against Norfolk Southern under the Federal Employees Liability Act, 45 U.S.C. § 51.

1

Norfolk Southern denied that it was solely negligent for the derailment and that plaintiff was negligent as well.  Norfolk Southern also contested the extent and cause of plaintiff's alleged injuries.

On February 24, 2009, plaintiff filed a motion for partial summary judgment asking the court to find that defendant's violations of certain federal regulations and its own safety rules constituted negligence per se.  By Judgment Order entered September 30, 2009, plaintiff's motion for partial summary judgment was granted in part and denied in part.  Specifically, plaintiffs's motion for partial summary judgment was granted to the extent that he had proven his entitlement to a jury instruction that defendant was negligent per se.  In all other respects, including that portion of his motion requesting that defendant be barred from arguing contributory negligence, the motion was denied.

Trial of this matter began on November 17, 2009.  After a five-day trial, the jury returned a verdict finding NSRC at fault and awarded plaintiff damages in the amount of $3,431,026.00.[1] The jury further found against Norfolk Southern on the issue of contributory negligence, determining that Koger himself was not negligent.  On November 23, 2009, the court entered judgment in

---

[1] Plaintiff had requested $1,931,026.00 in lost wages and benefits and the court did not allow Koger's counsel to suggest a specific amount of damages for pain and suffering.

2

plaintiff's favor in the amount of $3,431,026.00.  The instant
motion followed.

## II. Standard

**A.    Motion for New Trial**

Pursuant to Federal Rule of Civil Procedure 59, a court may
"on motion grant a new trial on all or some of the issues . . .
after a jury trial, for any reason for which a new trial has
heretofore been granted in an action at law in federal court."
According to our court of appeals, "[a] new trial is warranted
when (1) the verdict is against the clear weight of the evidence;
(2) the verdict is based upon evidence which is false; or (3) the
verdict will result in a miscarriage of justice."  Conner v.
Schrader-Bridgeport Intern., Inc., 227 F.3d 179, 200 (4th Cir.
2000) (quoting Atlas Food Sys. and Serv., Inc. v. Crane Nat'l
Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996)).  "The grant or
denial of a motion for a new trial is entrusted to the sound
discretion of the district court and will be reversed on appeal
only upon a showing of abuse of discretion."  Bennett v. Fairfax
County, 432 F. Supp.2d 596, 599 (E.D. Va. 2006).

**B.    Motion for Remittitur**

As to remittitur, the Fourth Circuit has stated:

> If we conclude that the jury's award of compensatory
> damages is excessive, we have the option of ordering a
> new trial nisi remittitur.  Remittitur, which is used
> in connection with Fed. R. Civ. P. 59(a), is a process,
> dating back to 1822, by which the trial court orders a

3

>new trial unless the plaintiff accepts a reduction in
>an excessive jury award.  Therefore, if a reviewing
>court concludes that a verdict is excessive, it is the
>court's duty to require a remittitur or order a new
>trial, and the failure to do so constitutes an abuse of
>discretion.

Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 305 (4th Cir. 1998)

(internal citations and quotations omitted).  "[J]ury

determinations of factual matters such as . . . the amount of

compensatory damages will be reviewed . . . by determining

whether the jury's verdict is against the weight of the evidence

or based on evidence which is false."  Id.

### III. Analysis

Defendant argues that a new trial is warranted because of

(1) an improper "send a message" closing argument by plaintiff's

counsel; (2) the court permitting plaintiff's economic expert to

revise his damage calculation on the eve of trial; (3) confusing

and misleading jury instructions; (4) the court's exclusion of

certain photographs taken by defendant's expert, Foster Peterson;

and (5) the court's exclusion of the expert testimony of George

Page.  The court takes each in turn.

**A.   Plaintiff's improper closing in which he invited the jury to
"send a message" to Norfolk Southern.**

During his closing, plaintiff's counsel made the following

argument:

>So if negligence has been proven, even before we
>started trial, and causation is so obvious, what did we
>spend four full days at trial doing?  It was primarily
>about one thing.  And we talked about damages, and

that's true, and that's very important.  That's the
essence of this case.  But what it was about was the
Norfolk Southern saving money.  Well, how was it about
the Norfolk Southern saving money?  Because they have
an affirmative defense called comparative negligence.
And comparative negligence means that if they can
convince you that any part of this was Larry Koger's
fault, then you'll hear in the instructions that
percentage that they can convince you was his fault
gets deducted from his damages. So whatever the
percentage is, that gets deducted from his damages, so
he has been compensated with less money than his
damages really are. And that's the law of comparative
negligence. Actually, it's a fair law. I take no issue
with it. But, on the facts of this case, I do.

So the Norfolk Southern has said it's Larry
Koger's - partially his fault.  And I'm going to do two
analyses for you, and one is I'm going to want you to
assume that Darrell Smith is the most honest man in the
world.  I'm going to ask you to assume that every
management person that took the witness stand is
telling the truth.  And then we'll talk about what the
evidence really showed.

So this is the railroad's fault, by the defendant's analysis, and
(Counsel illustrating.)  We're going to start by assuming that
they are equal on that.  In other words, we're not going to talk
about anything about who was actually - - had his hands on the
throttle, who actually operated  that locomotive, who made it go.
We're not going to talk about that yet.  The evidence is that the
locomotive engineer could see that signal 578 feet in advance,
ahead of the locomotive.  The evidence, if you are to believe the
defendant, is that Larry Koger can see at least that half of the
signal, the top and the bottom of that half, 161 feet from the
locomotive, not when he could see a quarter of the top of the
signal.  That was - - I mean, that's ridiculous.  But when he
could see the top and bottom mast, it was 161 feet.  So 578 feet
as opposed to 161 feet.  It's almost exactly three times the
distance.  If that's all we know, the railroad is three times at
fault.

Now let's talk about what the other facts are,
really, undisputed facts.  The engineer was the one who
violated the law.  That's the railroad.  The FRA looks
at that as the railroad violating the law, not Larry
Koger.  There is a stop law, and that applies to the
engineer.  So, now, that's a big chunk.  That brings

5

the railroad's negligence even more, because only the railroad side violated the law in that stop signal.

Now let's look at this and say the engineer has seven more years of experience at that yard than Larry Koger did . . . .

Now, the engineer said the signals were confusing. They were confusing. That means either one of two things. Either, a) the engineer was not properly trained, that he should be so confused; or b) those signals were really confusing. I'm not an engineer. I don't know the answer to that. But that's the railroad's responsibility. Either they didn't train him right or they put up signal masts that were confusing. That adds to the negligence. That cuts even more into this 25 percent.

Now, the engineer said - and this is crucial - it's the dispatcher, Francine. The dispatcher didn't use the job symbol U97 . . . . Okay.

Now, either the dispatcher was negligent in that she didn't say the symbol and the wrong crew understood it and moved on it improperly, or she was - - she hit the wrong button. In other words, she flipped and "advanced approach" when she should have flipped a green - - or what on the railroad is a "go ahead." Either she - - it's one or the other. But that's huge, because if she had done her job right, there wouldn't have been any confusion. That takes another big chunk out of this that's the railroad's fault.

And I could go on, but what's left here is something less than ten percent Mr. Koger's fault, if you are to believe that all the railroad's witnesses are honest, truthful, integrity, and that's the God's truth. But that's not what the evidence was.

On July 29, 2007, right after this accident, they re-railed that locomotive, same locomotive. It was still operable. The next crew that came on duty were Dustin Phillips and James Keith. Darrell Kohari got them aside and said, "We're going to run a sight distance reconstruction here. You guys are it. You're going to drop a crew pack, as soon as you see those signals, out the window. In fact, we'll put a water bottle so it weighs it down, you got some substance to

it when you fling it out the window." They did it the
first time, nothing happens. Nothing's flung out. No
one sees it, or not on the conductor's side anyway.
They do it a second time, just to be sure. Nothing.
Dustin Phillips said, "I didn't see the signal." No
argument. That's the other thing. It's not like Mr.
Kohari or Mr. Smith said, "Are you guys blind? Get
back in that locomotive." Or, "I'm going with you this
time." Nothing. "Okay. You're done. Thank you very
much." And Darrell Smith then testifies a few days
later, 261 feet. Larry, you are fired. You are fired.

                        * * *

     What does that tell you about honesty and
integrity?

     And James Keith, 22 years experience with the
Norfolk Southern. He comes on the stand and he said:
Those men were never in that cab with us. Roadmaster
Smith was never in that cab. And we told them
afterwards that we couldn't see it. No argument, so we
went about our business.

     That's the first reenactment. And the burden of
proof is on the railroad on the issue of comparative
negligence. They have to prove it.

     The second reenactment, Mr. Vulmar and Mr. Kohari
go out there and somebody - - some mysterious person
told them to take photographs. Now, the only questions
were from defense counsel: "Were these photos from the
conductor's side?"

"Yes."

"Conductor's side?"

"Yes."

     There is no dispute they're from the conductor's
side, but that locomotive is either 73 or 75 feet long,
depending on the testimony that we've had. That
photograph is either taken standing on the - - standing
or sitting on the catwalk outside the cab or with a
zoom lens right against the glass of the rear window of
the locomotive. Nobody said that's the conductor's
view, because it wasn't the conductor's view. It

                          7

certainly wasn't Mr. Koger's view from the nose seat,
which would have been the westernmost seat as they
traveled eastern bound.

There is your second reconstruction.  Worthless.

* * *

Colon Fulk testified on this very photograph that
this could not have been Mr. Koger's view.  Why?  He
said, "Look how close the person is to the glass, and
look at the top of this seat."

* * *

Another part of this: We know the lead track gives
you a better view of the signal than track one, where
they were on.  James Keith took the witness stand and
said, "Looking at these photos, at least one of these
photos that caught part of these concrete barriers,
looks to me like that's on the lead."

I said, "Mr. Darrell Smith, you say these were
taken from the track one.  How do we know that from the
photos?"

He said, "Well, you can't tell from the photos."

I said, "So basically we have to trust your word
as to where these photos were taken?"

He said, "Yes."

Do you trust Darrell Smith?  Because if you don't,
if you don't know either whether or not to believe him,
the defendant has not proven its case on comparative
negligence.

If you were to award as much as one percent for
comparative negligence, it is a victory for the Norfolk
Southern railroad.  It means that it will have profited
from the deceit of its management employees.  And it's
not just Mr. Smith, although I think he takes the cake
by far.  Remember Mr. Kohari?  I think he's not a bad
guy, but he's got memory problems.  Remember, just on
August 8, just a few days after this accident, he's
asked at the hearing about measurements and he said,
"Well, I don't know about measurements.  Ask Mr. Smith.

8

He knows the measurements," even though Mr. Smith testified that it was Kohari that did the measurements with the wheel.

Then I asked Mr. Kohari in his deposition, "What about this reenactment?"

"I don't remember."

"You don't remember?  You remember Larry Koger's conversations, to the word, early that day, and you suddenly are having this black hole of memory when I ask you about the reenactment?"

I even tried to refresh - - I said, "What if Dustin Phillips and James Keith said that?"

"Well, maybe, yeah.  I don't know whether or not. I just can't remember."

Then he takes the stand and he says, "Oh, yeah, there was a crew pack, and I measured it."

I said, "What refreshed your memory?"

"Darrell Smith.  I talked to Darrell Smith."

You must send a message to the Norfolk Southern Railroad that falsification - -

MS BIRD:  Objection, Your Honor.

MR. FARINA:     - - of evidence - -

THE COURT:     What's the objection?

MS. BIRD:     Objection as to that line of argument. It's improper.

THE COURT:     Sustained.

MR. FARINA:     You must return a verdict that stands for the truth, and that means the defendant has not proven its case for comparative negligence.

Trial Transcript of November 23, 2009, pp. 22-32.

A careful examination of the allegedly improper argument demonstrates that the motion for a new trial should be denied. The context of the passage makes clear that plaintiff was not arguing for an award of punitive damages but, rather, trying to minimize any finding on comparative negligence.  When plaintiff's closing is viewed in its totality, the court is unable to find that the "send a message" argument is a request for punitive damages.  Greenleaf v. Garlock, Inc., 174 F.3d 352, 364 (3d Cir. 1999) (plaintiff's argument that a verdict for plaintiff would "send a message to the folks at Owens" did not approach the level of attorney misconduct found to prejudice the jury); Ventas, Inc. v. HCP, Inc., 2009 WL 3855638, *6-7 (W.D. Ky. 2009) (denying motion for new trial based on plaintiff's "send a message" argument where argument was not seeking additional damages but was aimed at stopping defendant's type of behavior); Alkire v. Mariott Intern., Inc., 2007 WL 1041660, *7 (D.D.C. 2007) (finding that argument that jury should send a message regarding the type of behavior engaged in was aimed more at negligence than damages and did not warrant a new trial); Third Wave Tech., Inc. v. Stratagene Corp., 405 F. Supp.2d 991, 1010 (W.D. Wis. 2005) (finding that plaintiff's statement that jury should "send a strong message to [the defendant] and to the other [people like the defendant] out there" that this behavior is unacceptable did not warrant a new trial because the plaintiff limited the

10

argument to "teaching defendant and others that there is a consequence" to their behavior.); <u>Nice v. ZHRI, Inc.</u>, 105 F. Supp.2d 1028, 1029 (E.D. Ark. 2000) ("[I]t is appropriate to ask the jury to `send a message' if counsel is not seeking an inappropriate punitive damage award.").

Furthermore, even were the court to find the send-a-message argument was improper, counsel's objection thereto was promptly sustained. <u>Mosser v. Fruehauf Corp.</u>, 940 F.2d 77, 82 (4th Cir. 1991) ("The district court cut short the line of argument and carefully instructed the jury counsels' statements in closing argument were not evidence."). Norfolk Southern failed to request a more specific curative instruction. "Under these circumstances," counsel's remark does not "rise to a level warranting a mistrial." <u>Id.</u>

The court also concludes that its jury instructions cured any prejudice resulting from the allegedly improper remark. Prior to closing arguments, the court instructed the jury that "closing arguments are not evidence." Trial Transcript of November 23, 2009, p. 17. In addition, the jury in this case was specifically instructed:

> \*      You have been chosen and sworn as jurors in
>        this case to try the issues of fact presented
>        by the allegations of the plaintiff and the
>        defenses of the defendant.  You are to
>        perform this duty without bias or prejudice
>        as to any party.  Our system of law does not
>        permit jurors to be governed by sympathy,
>        prejudice or public opinion.

Although the statements and arguments of counsel are beneficial in aiding your understanding of the issues and evidence, they do not constitute evidence in the case, unless made as an admission or stipulation of fact.  When the attorneys on both sides stipulate or agree as to the existence of a fact, however, you must accept the stipulation as evidence, and regard that fact as proved.

* Any evidence to which an objection was sustained by the court and any evidence ordered stricken by the court must be entirely disregarded.

* You should consider the following elements of damages:

1. The physical pain and mental and emotional suffering plaintiff has experienced and is reasonably certain to experience in the future;
2. The nature and extent of plaintiff's injury, whether the injury is temporary or permanent and whether any resulting disability is partial or total;
3. The earnings plaintiff has lost to date and the present value of earnings plaintiff is reasonably certain to lose in the future.

Remember, throughout your deliberations you must not engage in any speculation, guess, or conjecture and you must not award any damages by way of punishment or through sympathy. You may not include in your award any sum for court costs or attorney fees.

Trial Transcript of November 23, 2009, pp. 77-92.  See Ventas, Inc. v. HCP, Inc., 2009 WL 3855638 (W.D. Ky. 2009) ("[E]ven if prejudice otherwise could be found in the [argument] at issue, any prejudice was cured by the Court's specific instruction to the jury that attorney comments were not evidence and that only evidence was to be considered.") (internal citations omitted).

12

Finally, "[i]n determining whether there is a reasonable probability that the verdict of a jury has been influenced by improper conduct, warranting a new trial, the Court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the Court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself." <u>Michigan First Credit Union v. Cumis Ins. Soc., Inc.</u>, 2009 WL 1664088, at *7 (6th Cir. 2009) (holding that improper analogy used by plaintiff's counsel in closing did not warrant a new trial because it consumed little more than one page in a transcript of argument that exceeded one hundred pages and following a trial that spanned three weeks).  In this case, Mr. Farina made one potentially objectionable isolated comment, during closing arguments, after four days of trial.  Accordingly, "there is simply no evidence that Plaintiff's argument `permeated the entire atmosphere of the trial' or caused the jury to make its determination on improper grounds." <u>Ventas, Inc. v. HCP, Inc.</u>, 2009 WL 3855638, *6 (W.D. Ky. 2009); <u>Third Wave Tech., Inc. v. Stratagene Corp.</u>, 405 F. Supp.2d 991, 1010 (W.D. Wis. 2005).

**B.    The court erred by allowing Dr. Thompson to amend his expert report.**

Dr. G. Richard Thompson was retained by plaintiff to testify regarding his damages.  On February 9, 2009, Dr. Thompson

prepared his expert report and he was deposed on May 23, 2009.
In his report, Dr. Thompson calculated the present value of the
diminution in plaintiff's pension benefits caused by his injury.

"Pursuant to the Railroad Retirement Act of 1974, 45 U.S.C.
§ 231 et seq., the Railroad Retirement Board administers
disability and retirement annuities for eligible railroad
workers, paid from a fund maintained by the United States
Treasury." Rachel v. Consolidated Rail Corp., 891 F. Supp. 428,
429 (N.D. Ohio 1995).  As the Rachel court further explained

> The internal revenue code requires employees and
> employers alike to contribute tax payments to the
> annuity fund.  Both employees and employers presently
> pay an amount equal to 7.65% of the employee's gross
> wage in "Tier 1" taxes, which taxes sustain the
> Railroad Retirement Board Disability and Retirement
> Annuities that supplant social security benefits.  The
> employee pays an additional 4.9% of his total
> compensation as a "Tier II" tax toward the retirement
> fund's pension component, and the employer adds an
> amount equal to 16.1% of the employee's compensation in
> Tier II taxes. . . .  Eligibility for increased
> retirement annuities depends upon the worker's age and
> years of service.  The size of a retiree's annuity is
> measured as a fixed percent of his highest sixty months
> of compensation, with certain allowances made based on
> his years of service.

Id. (internal citations omitted).  "Under FELA, an injured
employee is entitled to recover damages for any diminution of the
plaintiff's retirement benefits caused by his injury." Adams v.
Burlington Northern R. Co., 865 S.W.2d 748, 750 (Mo. Ct. App.
1993); see also Rachel v. Consolidated Rail Corp., 891 F. Supp.
428, 429-30 (N.D. Ohio 1995) ("Had Plaintiff continued in

Defendant's employ until his natural retirement, he would have been eligible for a larger retirement annuity. Defendant concedes Plaintiff's right to seek damages that reflect the loss of that annuity.").

Dr. Thompson calculated the diminution in Koger's pension benefits by totaling the amount of Tier 1 and Tier II taxes that defendant would have paid had Koger continued working until retirement age. Relying on the Supreme Court's decision in Norfolk & Western Railway Co. v. Liepelt, 444 U.S. 490 (1980)[2], several courts have rejected Dr. Thompson's methodology for making this type of calculation. See Rachel v. Consolidated Rail Corp., 891 F. Supp. 428, 430 (N.D. Ohio 1995) ("[T]he total tax contributions by the parties do not fairly approximate the value of Plaintiff's loss."); Adams v. Burlington Northern R. Co., 865 S.W.2d 748, 751 (Mo. Ct. App. 1993) ("Any link between the taxes paid and the benefits is too tenuous to provide a true measure of plaintiff's loss. The statute describes the method for computing retirement benefits. . . . To determine the plaintiff's lost retirement benefits, one should simply apply the formula in order to arrive at two numbers: (1) the amount plaintiff would have been entitled to if he had continued to work until age 66, and

---

[2] In Liepelt, the Court recognized "after-tax income, rather than . . . gross income before taxes," as the true measure of a deceased railroad employee's damages for lost income. Norfolk & Western Railway Co. v. Liepelt, 444 U.S. 490, 493 (1980).

(2) the amount plaintiff will actually be entitled to.  The difference between these two amounts, discounted to present value, represents plaintiff's lost benefits.").  Despite the aforementioned rejection of his methodology, Dr. Thompson testified in his deposition that he used it because it was impossible to know what Congress would do with respect to raising the amount of pension benefits for railroad employees.

On October 1, 2009, Norfolk Southern filed a motion in limine to exclude that portion of Dr. Thompson's testimony that relies on employer contributions to plaintiff's retirement benefits.  Specifically, Norfolk Southern asked the court to exclude that portion of Dr. Thompson's testimony "that relies on employer contributions to Plaintiff's retirement benefits in his calculation of Plaintiff's monetary damages because such testimony would be based on calculations not permitted by law." Defendant's Motion in Limine, p.1.  Plaintiff responded by defending Dr. Thompson's methodology.  In the alternative, plaintiff requested that he be allowed to offer an amended calculation consistent with Rachel and Adams.

On October 19, 2009, at the pretrial conference in this matter, the court took up defendant's motion in limine regarding Dr. Thompson.  The court asked defendant how it would be prejudiced by allowing Dr. Thompson to amend his calculation regarding fringe benefits such that it complied with the

16

methodology advanced by defendant.  Plaintiff represented to the court that an amended calculation could be prepared that same day.  Defendant did not articulate any prejudice it would suffer from a revised calculation.  Defendant did not assert, as it does now, that it would need to retain an economic expert.  Nor did it ask for a continuance to retain one.  Defendant also did not seek to reopen Dr. Thompson's deposition.

The day before the trial began, at the final settlement conference, the court asked defendant whether it had received Dr. Thompson's amended calculation and defendant responded in the affirmative.  Again, defendant raised no objection to the amendment nor did it ask for leave to obtain an economic expert out of time.  Dr. Thompson testified at trial that the diminution in Koger's pension benefits was $272,021 and defendant did not object to the amended calculation.

Based on the foregoing, it is clear that a new trial is not warranted solely because the court allowed Dr. Thompson to amend his calculation such that it complied with the methodology advanced by defendant.  As noted above, defendant never asked the court for additional time or the opportunity to consult with or retain an economic expert.  Accordingly, the suggestion in its briefing on the current motion that it was prejudiced because the court did not "afford[] NSRC the opportunity to substantially address the same through expert testimony" seems disingenuous.

17

This is all the more true given that defendant made the decision
that it did not need its own economic expert despite the fact
that plaintiff's economic expert had calculated his economic
losses at close to $2 million.  Only after trial and the jury's
verdict - which demonstrates acceptance of Dr. Thompson's
$1,931,026 damage figure, did Norfolk Southern claim the need for
an economic expert.  Furthermore, even if a new trial were
somehow warranted (and the court does not believe it is), it is
clear that a new trial for this reason would be limited to
damages for loss of retirement benefits.

**C.   The court's jury instructions misled the jury.**

Defendant argues that the jury instructions in this case
were so misleading that the jury could have believed plaintiff
himself was negligent but attributed that negligence solely to
defendant.  Defendant makes this argument despite the fact that
the court gave detailed instructions on contributory negligence
and the jury, in its verdict, expressly found that plaintiff
himself was not negligent.

"A jury charge must be construed in light of the whole
record."  Abraham v. County of Greenville, 237 F.3d 386, 393 (4th
Cir. 2001).  A court's jury instructions are reviewed for an
abuse of discretion, see Chaudhry v. Gallerizzo, 174 F.3d 394,
408 (4th Cir. 1999), and "[a] judgment will be reversed for error
in jury instructions `only if the error is determined to have

been prejudicial, based on a review of the record as a whole.'"
Abraham, 237 F.3d at 393 (quoting Wellington v. Daniels, 717 F.2d
932, 938 (4th Cir. 1983)); see also Buckley v. Mukasey, 538 F.3d
306, 322 (4th Cir. 2008) (same); Hall v. Wal-Mart Prop., Inc.,
2003 WL 22391060, *1 (4th Cir. 2003)("[E]ven where jury
instructions are flawed, there can be no reversal unless the
error seriously prejudiced the plaintiff's case.").

Reviewing the instructions in this case in their totality,
the court concludes that the jury was properly instructed on
contributory fault and finds no prejudice suffered by defendant.

**D.   The court erred in excluding the testimony of George Page.**

For the reasons expressed in the court's Memorandum Opinion
and Order of February 23, 2010, the court concludes that a new
trial is not warranted based upon the exclusion of Mr. Page's
testimony.

**E.   The court erred in excluding the July 29, 2009 photos taken
by Foster Peterson.**

At the trial, defendant sought to use photographs, taken on
July 29, 2009, by its expert witness Foster Peterson.  Even
though the photographs were taken after the close of discovery
and should therefore have been produced immediately, defendant
waited almost three months before producing the photos to
plaintiff.  Defendant could offer no reason justifying the late
production of the photographs.  Furthermore, given the ongoing
controversy regarding the reliability of other photos and

reconstructions proffered by defendant, <u>see</u> Section III(A) above, the court found that plaintiff would be prejudiced by admission of the photos.  For these reasons and other reasons placed on the record on November 18, 2009, and November 19, 2009, the court excluded the photos.

One final point bears mentioning.  At oral argument on this motion, counsel for defendant suggested that the court was not applying the Federal Rules of Civil Procedure consistently to both parties.  Specifically, defendant argued that the court could not require defendant's strict compliance with the rules (the Foster Peterson photographs) but relax those same rules for plaintiff (Dr. Thompson's amended calculation).  As discussed above and expressed more fully in the record, the court has given reasons for its handling of what it considers to be two completely different situations.  However, a review of the record in its entirety will demonstrate that, on more than one occasion, the court overlooked defendant's misunderstanding of or blatant disregard for the Federal Rules of Civil Procedure.  Accordingly, any claim of bias or unfair treatment is without merit.

**F.   The court should order a remittitur because the jury's verdict was against the clear weight of the evidence.**

The jury awarded plaintiff $3,431,026.00 in damages.  The parties agree that this amount likely represents the sum of plaintiff's damages for lost wages and benefits as testified to by his economic expert ($1,931,026.00) and another $1,500,000.00.

20

According to Norfolk Southern, the $1,500,000.00 "undoubtedly contains an improper punitive aspect."  Norfolk Southern further argues that even if the $1.5 million was not punitive in nature that it was against the clear weight of the evidence.

The jury was instructed that it should consider the following elements of damages:

> 1.    The physical pain and mental and emotional suffering plaintiff has experienced and is reasonably certain to experience in the future;
>
> 2.    The nature and extent of plaintiff's injury, whether the injury is temporary or permanent and whether any resulting disability is partial or total;
>
> 3.    The earnings plaintiff has lost to date and the present value of earnings plaintiff is reasonably certain to lose in the future.
>
> Remember, throughout your deliberations you must not engage in any speculation, guess, or conjecture and you must not award any damages by way of punishment or through sympathy. You may not include in your award any sum for court costs or attorney fees.

Trial Transcript of November 23, 2009, pp. 77-92.  The instructions make clear that the jury was explicitly told not to award punitive damages.  "[J]uries are presumed to follow the court's instructions."  CSX Transp., Inc. v. Hensley, 129 S. Ct. 2139, 2140 (2009).  For this reason and as discussed in Section III (A) above, the court does not agree with Norfolk Southern that any portion of the jury's verdict is punitive in nature.

21

Norfolk Southern also argues that the verdict was against the clear weight of evidence.  The court cannot agree.

"Ordinarily of course, the amount of damages is for the jury and whether a verdict should be set aside as excessive is a matter resting in the discretion of the trial judge." <u>Virginia Railway Co. v. Armentrout</u>, 166 F.2d 400, 407 (4th Cir. 1948). The evidence presented at trial was that plaintiff was 32 years old and healthy at the time of his injury, gainfully employed in a physically demanding job.  After the derailment, plaintiff was diagnosed with a herniated disc, impinging on the spinal nerve-root at level L5-S1.  After six months of conservative treatment, plaintiff underwent a spinal fusion.  One year after surgery, plaintiff's physician determined that plaintiff had reached his maximum medical improvement and that he would be permanently disabled from returning to work as a conductor.  Dr. Kropac restricted plaintiff to lifting a maximum weight of twenty pounds on occasion, with no stooping, bending, or crouching.

Koger testified that he had endured and continued to suffer from substantial pain on a daily basis when engaging in virtually all activities.  To that end, he takes prescription pain medication on a daily basis.  He testified that he had trouble sleeping and was restricted in his ability to engage in leisure and sporting activities or help around the house as he had done before his injury.  Koger testified that his injury had impacted

22

his ability to play with his children.  There was also medical
testimony that plaintiff might have to undergo a second surgery
in the future.

Given the foregoing, the court cannot conclude that the
jury's award of $1.5 million for pain and suffering associated
with plaintiff's permanent disability was against the clear
weight of the evidence.  Furthermore, a review of similar cases
also corroborates the court's conclusion that the jury's award,
while large, is supported by the evidence.  See, e.g., Frazier v.
Norfolk & W. Ry. Co., 996 F.2d 922, 925-26 (7th Cir. 1993)
(upholding award of $1,000,000 for past and future pain and
suffering where injury resulted in surgery and chronic pain);
Ahlf v. CSX Trans., Inc., 386 F. Supp.2d 83, 90 (N.D.N.Y. 2005)
(FELA case refusing to reduce jury award of $1,750,000 for past
and future pain and suffering where former employee suffered back
injury requiring surgery); Pace v. Nat'l R.R. Passenger Corp.,
291 F. Supp.2d 93, 104 (D. Conn. 2003) (upholding a jury verdict
of $1,275,000 for pain, suffering, mental anguish, and loss of
enjoyment of life's activities where plaintiff suffered two
herniated disks and required surgery); Bean v. CSX Trans., Inc.,
289 F. Supp.2d 277, 284 (N.D.N.Y. 2003) (upholding a $1,100,000
award for pain and suffering where plaintiff had a spinal fusion,
continued to experience pain, and likely faced further surgery).

These cases and the authorities cited therein confirm that this verdict falls within the reasonable range of verdicts.[3]

### IV.  Conclusion

For all the foregoing reasons, defendant's motion for a new trial or, in the alternative, remittitur is DENIED.

The Clerk is directed to send copies of this Memorandum Opinion and Order to counsel of record.

IT IS SO ORDERED this 24th day of February, 2010.

ENTER:

David A. Faber
Senior United States District Judge

---

[3] In its reply brief, defendant pointed the court to several cases where plaintiffs were awarded lesser amounts for back, neck, and or knee injuries.  Some of the factors the courts considered in evaluating whether to reduce the damage awards were (1) the age of the plaintiff; (2) whether surgery was required; (3) whether medication was required; (4) evidence of past and future pain; and (5) whether plaintiff could return to work. Consideration of these factors supports allowing the jury's verdict to stand in this case.  Plaintiff was only 32-years old at the time of his injury.  He underwent surgery for his injury and further surgery might be required.  He continues to experience daily pain despite the use of prescription medication. Plaintiff also is unable to return to his former employment and, based on the evidence at trial, given his education and experience it is unlikely he would be able to find a position offering a similar salary and benefits.